# United States Court of Appeals
## For the First Circuit

No. 22-1523

EDSON PIRES ROSA,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Montecalvo, Lipez, and Rikelman,
Circuit Judges.

Tara Djukanovic, Supervised Law Student, with whom Tiffany J. Lieu, Harvard Law School Crimmigration Clinic, Carlos E. Estrada, and Estrada Law Office were on brief, for petitioner.
Tim Ramnitz, Senior Litigation Counsel Office of Immigration Litigation, with whom Brian Boynton, Assistant Attorney General, Office of Immigration Litigation, and Shelley R. Goad, Assistant Director, Office of Immigration Litigation were on brief, for respondent.

August 16, 2024

**MONTECALVO, Circuit Judge.** Petitioner Edson Pires Rosa ("Rosa") sought to become a lawful permanent resident ("LPR") through an adjustment-of-status process after his visitor visa expired. Rosa now seeks review of a decision of the Board of Immigration Appeals ("BIA") affirming the immigration judge's ("IJ's") denial of his application for adjustment of status under 8 U.S.C. § 1255 and deeming waived any challenge to the IJ's denial of his request for voluntary departure. The BIA affirmed the IJ's denial of Rosa's application for adjustment of status as a matter of discretion based solely on its finding that a police report and pending charge against Rosa for alleged rape of a minor outweighed several positive factors that supported Rosa's application for discretionary relief. The BIA also ruled that Rosa did not challenge the IJ's denial of his request for voluntary departure, and he thus waived BIA review of that issue. Before us, Rosa asserts that the BIA committed at least four different errors of law that necessitate remand. For the reasons that follow, we grant the petition for review, vacate the order of the BIA as to adjustment of status and voluntary departure, and remand to the BIA for further consideration in accordance with this opinion.

## I. Background

Rosa, a citizen of Cape Verde, entered the United States on a visitor visa on April 3, 2015, when he was fourteen years old. While living in this country, Rosa finished high school and

worked to contribute to his family's household expenses. His visitor visa expired on October 2, 2015, but, on November 2, 2015, Rosa's mother, who had recently become an LPR, filed an I-130 "Petition for [Noncitizen] Relative" for Rosa. United States Citizenship and Immigration Services ("USCIS") approved that petition on March 9, 2016, but Rosa's subsequent application for adjustment of status was denied on August 17, 2018.

In June 2019, police officers responded to a report by J.P., a fifteen-year-old high school student who accused Rosa of participating in a sexual assault she endured. The officers compiled a police report with several narratives describing the interviews of individuals involved in the alleged incident, including J.P., Rosa, and Rosa's brother. J.P.'s narrative recounts her statements in a Sexual Abuse Intervention Network interview conducted by a forensic interviewer. In her interview, J.P. alleged that on June 4, 2019, she walked home from school to Rosa's house with Rosa, who was her classmate at the same high school. After arriving at Rosa's house, she accompanied Rosa to his bedroom, where she watched television while Rosa was on his phone. At some time thereafter, she alleged that two males she did not know walked into Rosa's room. Rosa and one of the other males walked out of the room and closed the door behind them, leaving her with the third male. But, when she tried to leave, Rosa and the second man reentered the room. J.P. alleged that

Rosa helped the other two individuals take her clothes off and hold her down while those individuals sexually assaulted her. After they had finished, J.P. left. She explained that, while she did not initially tell anyone about the incident, she was later prompted to tell her cousin about what happened after hearing rumors of a video of the alleged assault.

The police report also includes narratives covering police interviews of Rosa and one of his brothers, whom J.P. alleged was one of the other two men involved in the assault. According to those narratives, in their separate interviews, Rosa and his brother denied J.P.'s allegations. They did not deny, however, that J.P. had been at their house that day, but they asserted that J.P. initiated and performed consensual sexual acts (of a different type than those that J.P. alleged occurred) on the two of them and a third individual, and that there was no force involved.

On September 17, 2019, the state of Massachusetts filed a criminal complaint against Rosa. Rosa was subsequently arrested and indicted for rape of a minor, and a state court in Massachusetts released Rosa on bond. Rosa does not have any prior criminal history.

On December 21, 2020, the Department of Homeland Security ("DHS") issued Rosa a Notice to Appear, charging him with removability under 8 U.S.C. § 1227(a)(1)(B) for overstaying his

visa and placing him in removal proceedings. DHS detained Rosa in immigration detention.

Rosa applied for asylum and withholding of removal and requested voluntary departure in the alternative, in February 2021. The IJ assigned to the case at the time, IJ Todd A. Masters, denied Rosa's applications for asylum and withholding of removal a few months later. However, IJ Masters granted Rosa's request for voluntary departure as a matter of discretion, finding that the positive equities in Rosa's case outweighed the single negative equity of his pending criminal charge.

Rosa appealed IJ Masters's denial of asylum and withholding of removal; neither party appealed the grant of voluntary departure. While his appeal was pending before the BIA, Rosa's mother became a U.S. citizen, making him potentially eligible for adjustment of status as an immediate relative of a U.S. citizen. Accordingly, Rosa filed with the BIA a motion to remand his case to the IJ so that he could pursue adjustment of status. Over DHS's opposition, the BIA granted Rosa's motion to remand on October 18, 2021, finding that the IJ should consider the application to adjust status in the first instance and declining to reach the issues of asylum and withholding of removal. Rosa subsequently submitted an application for adjustment of status.

Rosa's case was assigned to a new IJ on remand: IJ Shelly W. Schools. IJ Schools held a hearing in January 2022, at which she confirmed that the parties agreed that Rosa had prima facie eligibility for adjustment of status and that the primary issue before the court was whether the application to adjust status should be granted as a matter of discretion. Rosa's counsel indicated that the criminal case against him remained pending, and, when IJ Schools asked, after confirming and marking all evidence in the record, whether there were any objections that needed to be addressed, neither side raised any issue.

Rosa testified in support of his application to adjust status at the hearing, stating that he came to the United States as a teenager, attended and graduated from high school, had a job during and after high school, and contributed to household expenses. When asked about the pending criminal charge, however, Rosa elected to exercise his Fifth Amendment right not to testify, noting that he "was advised not to discuss [the charge] without [his] criminal lawyer being present." In response to a question by the government, he confirmed that the pending charge was for rape of a minor, but he did not discuss the charge or the alleged events supporting the charge. Counsel for the government asked the IJ to "take a negative inference" from Rosa's failure to testify about the criminal matter because it was relevant to his application and the IJ's exercise of discretion. Rosa's counsel

averred that he had explained to Rosa that the IJ could draw a negative inference and consider that inference in her exercise of discretion and Rosa confirmed that he understood that his failure to answer questions about the criminal case could have consequences in his immigration case. Rosa's counsel also stated that Rosa "absolutely denies all the charges . . . and all the allegations made in the police report."

In a January 11, 2022, oral decision, IJ Schools stated that she was interpreting the BIA's remand order as a directive to address the adjustment of status application and to consider anew the applications for asylum, withholding of removal, and voluntary departure. IJ Schools then adopted IJ Masters's oral decision and reasoning as to IJ Masters's denial of Rosa's applications for asylum and withholding of removal. She also found Rosa "credible on the limited testimony that he did provide."

Turning next to the adjustment of status application, IJ Schools found that Rosa was statutorily eligible for adjustment of status and that the issue before the court was whether the court should grant the application to adjust status as a matter of discretion. IJ Schools first named several "positive factors weighing in [Rosa's] favor" in determining whether to exercise discretion: his significant family ties to the United States including his mother and siblings, his high school degree, his employment history, his contributions to his household including

financial support, and his residence in this country since he was a minor, for approximately six years. She then pointed to one "negative factor weighing against [Rosa]": the "current criminal indictment that is pending in Massachusetts for rape of a child." She noted that "[t]he details of the criminal case can be found in Exhibit 2 . . . where there is a narrative of the named victim's complaint and allegations against [Rosa]. There is also a narrative of an interview with [Rosa] and other information about the pending criminal case." She proceeded to summarize the complainant's allegations against Rosa in the police report before stating the following concerning Rosa's decision to invoke his Fifth Amendment right against self-incrimination:

> Although [Rosa] may deny these allegations, he declined to answer any questions today about the pending criminal complaint. The Court certainly understands why he would not want to address the merits of such serious allegations while they are still pending. However, the Court can consider and should consider his refusal to provide any information about the circumstances of this complaint in deciding discretionary matters including whether to grant his adjustment of status application. So basically[,] the Court does not have his side of the story other than what is contained in Exhibit 2 [(the police report)]. The Court also has this very serious criminal complaint from this minor victim who describes in pretty good detail not only what happened to her, but information about his residence and his bedroom, where things were placed[,] and a description of the other men who were there on that day.

IJ Schools then concluded, "[t]he Court finds that these allegations are so serious as to be the basis for denying favorable discretion in [Rosa's] case."

Before moving on to the next issue, IJ Schools distinguished Rosa's case from an en banc decision of the First Circuit that had issued the day before the hearing and oral decision by IJ Schools: Diaz Ortiz v. Garland, 23 F.4th 1 (1st Cir. 2022) (en banc) (reviewing the IJ and BIA's reliance on a "Gang Assessment Database," which included a "collection of law enforcement field reports" and which petitioner argued was not reliable). IJ Schools distinguished Diaz Ortiz on the basis that in Rosa's case,

> [t]here is nothing really in the record that causes this Court to question the reliability of the criminal complaint. Again, the Court does not have [Rosa's] side of the story other than what he told the police back in June 2019 or back in 2019 when he was interviewed. What the Court does have is a very detailed complaint from the victim, and the Court does find that the information is sufficiently reliable where the Court can rely on it in making a discretionary decision in this case.

IJ Schools then denied Rosa's application for adjustment of status because she found that Rosa "does not merit favorable discretion."

Finally, IJ Schools "disagree[d] with the decision of [IJ Masters]" on how to balance the equities for purposes of the discretionary determination as to the voluntary departure request. She found that, for the reasons described under the adjustment of

status analysis, "the negative equity of th[e] serious pending complaint outweigh[ed] the positive[]" equities in Rosa's case, and she thus "denie[d] [Rosa's] request for voluntary departure as a matter of discretion."

Rosa subsequently appealed IJ Schools's decision to the BIA. His brief to the BIA alleged that IJ Schools "erred in multiple respects," including by denying adjustment of status and "by not accepting the previous favorable exercise of discretion from IJ Masters in granting [Rosa's] request for voluntary departure."

The BIA upheld IJ Schools's denials of relief and dismissed Rosa's appeal in a single-judge decision issued on June 3, 2022. It first noted that Rosa had not challenged IJ Schools's denials of asylum, withholding of removal, and voluntary departure, and it thus deemed those issues waived. The BIA then turned its focus to the appeal of IJ Schools's discretionary denial of Rosa's application for adjustment of status. It cited its precedential decision in Matter of Thomas, 21 I. & N. Dec. 20 (BIA 1995), to support the propriety of the agency's reliance on evidence of criminal conduct "which did not result in a conviction" in making a discretionary determination. It then concluded:

> The weight to be accorded such conduct necessarily varies depending upon the facts of each individual case, but in this instance we find no error in the [IJ's] assessment that [Rosa's] criminal history is a significant

- 10 -

negative factor militating against a favorable exercise of discretion. . . . Upon de novo review, we agree with the [IJ] that the significant negative factor of [Rosa's] criminal indictment for rape of a child, which remains pending, including the information found in the victim's complaint regarding the alleged incident, outweigh[s] the favorable factors she set forth.

The BIA then addressed Rosa's argument concerning IJ Schools's treatment of his decision not to testify. It stated:

While [Rosa] argues that it was error for the [IJ] to "hold against" [Rosa] the fact that he chose not to testify as to the pending criminal matter, we do not find that she did so. [Rosa] was free to invoke the privilege against self-incrimination under the Fifth Amendment to the United States Constitution. However, the [IJ] properly found that the lack of any testimony refuting the version of events portrayed in the victim's complaint and other documentary evidence pertaining to the criminal indictment seriously diminished [Rosa's] ability to meet his burden of demonstrating that he warranted a favorable exercise of discretion.

The BIA also agreed with IJ Schools's finding that Rosa's case was distinguishable from this court's en banc decision in Diaz Ortiz, explaining that it would not extend Diaz Ortiz to find that the "victim's complaint" against Rosa was "similarly unreliable" to the "Gang Assessment Database" at issue in Diaz Ortiz. Finally, the BIA rejected Rosa's contention that IJ Schools was required to favorably exercise discretion on adjustment of status because IJ Masters had previously determined that Rosa warranted a favorable exercise of discretion as to voluntary departure.

- 11 -

Rosa timely filed a petition for review of the BIA's decision and sought a stay of removal. In response, the government filed an opposition to the stay request as well as a motion to dismiss the petition for lack of jurisdiction. A different panel of this court denied the request for a stay, and the government subsequently deported Rosa to Cape Verde. We now address both the government's motion to dismiss the petition for lack of jurisdiction and the merits of Rosa's petition.

## II. Standard of Review

"In immigration cases, our review 'typically focuses on the final decision of the BIA.'" Khalil v. Garland, 97 F.4th 54, 61 (1st Cir. 2024) (quoting Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020)). But "to the extent that the BIA deferred to or adopted the IJ's reasoning, we review those portions of the IJ's decision" as well. Chavez v. Garland, 51 F.4th 424, 429 (1st Cir. 2022); see also Singh v. Garland, 87 F.4th 52, 57 (1st Cir. 2023).

Our jurisdiction to review the agency's discretionary decision-making in an immigration case is limited by statute. See 8 U.S.C. § 1252(a)(2)(B). As a general principle, a federal court lacks jurisdiction to review the agency's discretionary denial of an application for adjustment of status. Moreno v. Garland, 51 F.4th 40, 44-45 (1st Cir. 2022) (citing § 1252(a)(2)(B)). However, "an exception lies 'where the petition raises claims premised on constitutional claims or questions of law.'" Id. at 45 (quoting

- 12 -

Jaquez v. Holder, 758 F.3d 434, 435 (1st Cir. 2014)); accord § 1252(a)(2)(D). "Mixed questions of law and fact, even when they are primarily factual, fall within the statutory definition of 'questions of law' in § 1252(a)(2)(D) and are therefore reviewable." Wilkinson v. Garland, 601 U.S. 209, 225 (2024).

### III. Discussion

Rosa raises four specific challenges to the BIA's decision, which we consider in turn.

### A. Required Findings Under Arias-Minaya

Rosa first argues that the BIA committed legal error when it failed to make two threshold findings that our precedent requires before the agency may rely on a police report. In Arias-Minaya v. Holder, we held that limits on the agency's consideration of police reports "are generally satisfied as long as the trier first determines that the report is reliable and that its use would not be fundamentally unfair." 779 F.3d 49, 54 (1st Cir. 2015). Rosa's challenge under Arias-Minaya presents a legal question, which we have jurisdiction to consider, because he does not challenge "whether the police report was in fact reliable or its use fundamentally fair; but rather whether the [agency] made such . . . threshold determination[s] in the first instance." We have exercised jurisdiction to review such a question in past cases. See Lee v. Barr, 975 F.3d 69, 75 (1st Cir. 2020) (reviewing whether the agency made sufficient findings on reliability and

- 13 -

fundamental fairness under <u>Arias-Minaya</u> prior to relying on a police report); <u>Miranda-Bojorquez</u> v. <u>Barr</u>, 937 F.3d 1, 7 (1st Cir. 2019) (same).

IJ Schools made a sufficient reliability finding when she stated in her oral decision:

> [T]here is nothing really in the record that causes this Court to question the reliability of the criminal complaint. . . .  What the Court does have is a very detailed complaint from the victim, and the Court does find that the information is sufficiently reliable where the Court can rely on it in making a discretionary decision in this case.

Rosa asserts that, because this statement referred to the "criminal complaint" and not the police report explicitly, it did not constitute a reliability finding as to the police report.  As Rosa acknowledges elsewhere in his briefing, however, the record makes clear that the document that the IJ referred to throughout the hearing as a "complaint" is in fact the victim's narrative contained in the police report.  For instance, the IJ's oral decision states, "[t]he Court also has this very serious criminal complaint from this minor victim who describes in pretty good detail not only what happened to her, but information" about the setting of and people involved in the alleged assault.  The victim's narrative in the police report is the only document in the record that the IJ could be referring to in this passage of the oral decision.  Thus, Rosa's contention that the statements

about reliability quoted above pertained to a document other than the police report lacks merit.[1]

We find no error with respect to the BIA's reliability finding because the BIA referred to and affirmed the IJ's conclusion on the report's reliability. The BIA decision states: "Upon de novo review, we agree with the [IJ] that the significant negative factor of the respondent's criminal indictment for rape of a child, which remains pending, including the information found in the victim's complaint regarding the alleged incident, outweigh[s] the favorable factors she set forth." The BIA then cited both the police report and the pages of the IJ's decision that included the reliability finding. The BIA also cited and agreed with the IJ's finding that the report here is distinguishable from the "Gang Assessment Database" deemed

---

[1] At oral argument, Rosa's counsel briefly suggested that the IJ's reliability finding was insufficient even if we interpret "criminal complaint" to refer to the victim's narrative in the police report, because, at most, the IJ made a reliability finding as to that portion of the report (the victim's complaint) but not the police report as a whole. However, Rosa did not present this argument in his briefing, nor did he develop any argument for the notion that a reliability finding on only part of the report would be legally insufficient in this case, where the finding pertained to the only portion of the police report on which the IJ relied as the "basis for denying favorable discretion." Thus, we deem this argument waived. See Bernardo ex rel. M & K Eng'g, Inc. v. Johnson, 814 F.3d 481, 492 n.17 (1st Cir. 2016) (noting that an argument "raised . . . for the first time at oral argument . . . is waived"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

unreliable in Diaz Ortiz, 23 F.4th 1.[2]  The BIA explicitly declined to find the victim's narrative in the police report to be "similarly unreliable" to the "Gang Assessment Database" and cited the pages of the IJ's decision on which the IJ acknowledged the Diaz Ortiz case but explained why it found the victim's narrative in the police report here to be "sufficiently reliable."

Rosa asserts that such a reference is insufficient because the BIA had an independent obligation, when conducting de novo review, to conduct its own analysis and make findings on reliability and fundamental fairness.  But none of the cases that Rosa cites supports finding the BIA's reference to and adoption of the IJ's reliability finding to be insufficient in this case.  In Arias-Minaya, we noted that "the IJ determined (and the BIA confirmed) that the police report was reliable," and, "[s]imilarly, both the IJ and the BIA determined that use of the police report was not fundamentally unfair."  779 F.3d at 54. However, we did not address whether the BIA's reference to the

_____

[2] We reject Rosa's assertion that the BIA's discussion of the police report's reliability in the context of distinguishing Rosa's case from Diaz Ortiz "pertain[ed] to a separate inquiry entirely and thus d[id] not count as a reliability finding under Arias-Minaya."  Diaz Ortiz "contend[ed] that, unlike in" Arias-Minaya and Miranda-Bojorquez, a case applying Arias-Minaya, the agency failed to make a "threshold determination of reliability," as required by binding BIA precedent.  Diaz Ortiz, 23 F.4th 1, 16 (1st Cir. 2022) (en banc).  Therefore, Diaz Ortiz involved, in part, the same threshold reliability determination issue under Arias-Minaya that is at issue here.

IJ's reliability finding and its affirmance of the IJ's reliance on the police report constituted a sufficient finding by the BIA.

Rosa also points to Aguilar-Escoto v. Garland to suggest that "the BIA cannot here rely on the IJ's decision to fill holes in its own reasoning" because the BIA itself is "required to consider all evidence relevant to" the reliability determination. 59 F.4th 510, 517 (1st Cir. 2023).  But there, "the BIA's decision [gave] strong reason to believe the BIA turned a blind eye to key relevant evidence" because the BIA erroneously emphasized that the petitioner provided only two complaints, when in actuality, the petitioner had provided three.  Id. at 515-16.  In contrast, here, there is no "reason to believe the BIA was unaware of" relevant evidence, and thus "we have no reason to doubt that the agency considered the evidence."  Id. at 515 (quoting Domingo-Mendez v. Garland, 47 F.4th 51, 58 (1st Cir. 2022)).  Additionally, in the context of the discretionary determination at issue here, we lack jurisdiction to review any fact-bound challenge to the agency's weighing of the evidence -- including the weight it gave to the victim's narrative relative to Rosa's narrative or other evidence in the record -- in determining the police report's reliability. See Mele v. Lynch, 798 F.3d 30, 32 (1st Cir. 2015) ("Where Congress has enacted a jurisdictional wall, a noncitizen cannot scale it simply by 'relitigating whether the factors relevant to the discretionary relief were appropriately weighed by the IJ and the

- 17 -

BIA.'" (cleaned up) (quoting <u>Urizar-Carrascoza</u> v. <u>Holder</u>, 727 F.3d 27, 32 (1st Cir. 2013))). We hold that the agency made a sufficient finding of the police report's reliability, as required under <u>Arias-Minaya</u>.

We also find no error with respect to the fundamental fairness requirement imposed by <u>Arias-Minaya</u>. On this issue, the parties disagree over what constitutes an adequate fundamental fairness determination under the law. Rosa argues that both the IJ and the BIA were required to explicitly state a finding on the fundamental fairness of their respective reliance on the police report. In contrast, the government asserts that <u>Arias-Minaya</u> and its progeny merely require the agency to provide the petitioner an opportunity to be heard on the reliability of the police report. Put differently, so long as the agency provides the petitioner an opportunity to be heard, it satisfies the required fundamental fairness finding even without making an explicit finding or doing anything more on the matter.

The government's view on this requirement is correct. In <u>Arias-Minaya</u>, we explained that "[t]here are, of course, limits" on immigration courts' consideration of police reports, "but those limits are generally satisfied as long as the trier first determines that the report is reliable <u>and</u> that its use would not be fundamentally unfair." 779 F.3d at 54 (emphasis added). This language might, on its own, be read to require an explicit and

- 18 -

distinct finding of fundamental fairness by the agency prior to relying on a police report.  And the Arias-Minaya court concluded that there was no error in the agency's reliance on the police report in part because "both the IJ and the BIA determined that use of the police report was not fundamentally unfair since the petitioner was given an opportunity to challenge its veracity and refute its contents."  Id.  Accordingly, we take Rosa's point that this portion of Arias-Minaya could be read as imposing a burden on both the IJ and the BIA to make explicit fundamental fairness findings, and the stated basis for those findings in Arias-Minaya's case was the opportunity to "challenge [the report's] veracity and refute its contents."  Id.

A deeper look at our caselaw, however, demonstrates that we have not required the type of explicit finding on fundamental fairness that Rosa demands.  In Lee, the IJ did not make an explicit fundamental fairness finding but did "observe[] that [the petitioner] did not produce an affidavit or testimony from his wife denying what was in the report."  975 F.3d at 75.  Applying Arias-Minaya, we found "that opportunity to rebut a report bearing . . . indicia of reliability allows us to say in this context that use of the report was not fundamentally unfair."  Id. (citing Arias-Minaya, 779 F.3d at 54).  We then denied Lee's petition for review, in part because we saw no issue with the agency's reliance on the police report in that context.  Id. at 75-76.

- 19 -

Moreover, consistent with the Lee court's interpretation of Arias-Minaya, we do not see any requirement of an explicit fundamental fairness finding in the BIA decisions that Arias-Minaya cites as support for the reliability and fundamental fairness requirements. See Matter of Teixeira, 21 I. & N. Dec. 316, 321 (BIA 1996); Matter of Grijalva, 19 I. & N. Dec. 713, 721-22 (BIA 1988); Arias-Minaya, 779 F.3d at 54. Though the BIA stated in Matter of Grijalva that the use of documentary evidence must be fundamentally fair for the evidence to be admissible in immigration proceedings, the BIA did not mandate that the IJ or BIA state an explicit finding of fundamental fairness on the record prior to admitting and relying on police reports. 19 I. & N. Dec. at 722.

Nonetheless, Rosa points to Miranda-Bojorquez v. Barr, 937 F.3d 1 (1st Cir. 2019), a decision published before Lee, in support of his argument that Arias-Minaya requires an explicit fundamental fairness determination by the agency. There, we explained that "not only did the IJ find the reports reliable and that their use would not be fundamentally unfair, but he also gave [the petitioner] an opportunity to rebut their reliability. This is exactly what our precedents required the IJ to do." Id. at 7. The Miranda-Bojorquez court described Arias-Minaya as "upholding [the] admissibility of [a] police report after the agency determined its reliability and fairness and offered [the]

- 20 -

petitioner 'an opportunity to challenge its veracity and refute its contents.'" Id. (emphasis added) (quoting Arias-Minaya, 779 F.3d at 54). Standing alone, Miranda-Bojorquez appears to suggest that Arias-Minaya requires the agency to both make a fundamental fairness determination and, separately, give the petitioner an opportunity to rebut the reliability of the report. See id.

But because the IJ there provided the petitioner an opportunity to rebut the reports and also made an explicit fundamental fairness determination, the Miranda-Bojorquez panel did not confront the question of whether an opportunity to be heard alone was itself a sufficient fundamental fairness finding. See id. Meanwhile, in Lee, we confronted the exact question of whether providing an opportunity to rebut the evidence alone constitutes an adequate fundamental fairness finding, and we answered in the affirmative. See Lee, 975 F.3d at 75. Lee is the binding law of the circuit on this issue, and it requires us to conclude that the agency satisfied Arias-Minaya's fundamental fairness requirement by providing Rosa the "opportunity to rebut [the] report." Id.; see also Bogle v. Garland, 21 F.4th 637, 649 (9th Cir. 2021) (holding that "the BIA's reliance on the police report along with other evidence and testimony was not fundamentally unfair" where the petitioner "had a fair opportunity (actually several such opportunities) to dispute" the information contained in the report but "chose not to do so" (first citing Matter of Grijalva, 19 I.

& N. Dec. at 722; then citing Nijhawan v. Holder, 557 U.S. 29, 41 (2009); and then citing Arias-Minaya, 779 F.3d at 54)).

Accordingly, we find no error regarding the Arias-Minaya reliability and fundamental fairness requirements in the BIA's decision.

## B. Alleged Mischaracterization of Material Evidence

Rosa next argues that the BIA erred by mischaracterizing material evidence when it (1) relied on an "indictment" and "complaint" where neither exists in the record, and (2) stated that the record lacked "any testimony" refuting allegations in the case. We reject both arguments.

First, we find no error in the BIA's references to an "indictment" or "complaint" in full context of the BIA's decision and Rosa's case. Even though the indictment itself was not filed anywhere in the record, Rosa confirmed the fact that he had a pending charge against him for rape of a minor in his testimony before IJ Schools and in his application to adjust status. Additionally, DHS's "Record of Deportable/Excludable [Noncitizen]" Form I-213 -- which is also included in the administrative record -- notes that Rosa was indicted for rape of a minor. Because the fact of Rosa's indictment was reflected in the administrative record, we see no error in the BIA's reference to that fact in its decision.

Rosa's argument that the BIA improperly referenced a "complaint" also lacks merit. The BIA referred several times to "the victim's complaint," which, in context, clearly means the portion of the police report containing the "narrative" summarizing the interview with the complainant about her alleged assault. There is no basis to read the BIA's references to "the victim's complaint" as describing a formal criminal complaint (in the sense of a charging document) that is absent from the record. Thus, we reject Rosa's contention that references to the "complaint" suggest that the BIA mischaracterized the record and relied on "documents that simply do not exist in this closed record."

Finally, we again find no error in the BIA's statement that the record lacked "any testimony" refuting the allegations against Rosa. The BIA used this phrase in its discussion of Rosa's decision to "invoke the privilege against self-incrimination under the Fifth Amendment." It stated, "[T]he Immigration Judge properly found that the lack of any testimony refuting the version of events portrayed in the victim's complaint and other documentary evidence pertaining to the criminal indictment seriously diminished his ability to meet his burden of demonstrating that he warranted a favorable exercise of discretion." Immediately thereafter, the BIA cited the page of IJ Schools's decision discussing Rosa's decision to "decline[] to answer any questions today about the

pending criminal complaint" and acknowledging the existence of Rosa's narrative in the police report by noting that "the Court does not have his side of the story other than what is contained in [the police report]." Read in context, the BIA's reference to the lack of "any testimony" refuting the victim's allegations refers to the lack of any live testimony by Rosa at the hearing before IJ Schools concerning the criminal allegations against him. The citation to the IJ's discussion of Rosa's decision not to "answer any questions today" supports this reading of the BIA's use of the word "testimony" as referring to in-court testimony before the agency. And there is no reason to believe the BIA was unaware of the existence of Rosa's narrative in the police report, especially given that the BIA cited the portion of the IJ opinion in which the IJ referenced his narrative in the same paragraph of the BIA opinion regarding the "victim's complaint." Cf. Aguilar-Escoto, 59 F.4th at 515 ("When the BIA's decision is neither inconsistent with [the evidence at issue] nor gives reason to believe the BIA was unaware of it, we have no reason to doubt that the agency considered the evidence." (alteration in original) (quoting Domingo-Mendez v. Garland, 47 F.4th 51, 58 (1st Cir. 2022))); Domingo-Mendez, 47 F.4th at 58 (noting that "each piece of evidence need not be discussed in a [BIA] decision" and concluding that there was "'no reason to surmise that the BIA overlooked' the evidence in question" (alteration in original)

(first quoting Chen v. Holder, 675 F.3d 100, 106 (1st Cir. 2012); and then quoting Lin v. Mukasey, 521 F.3d 22, 28 (1st Cir. 2008))).[3]

For the reasons described above, we reject Rosa's assertion that the BIA erred by mischaracterizing material evidence in its references to an "indictment" or "complaint" or in its statement that the record lacked "any testimony" refuting the allegations against Rosa.

**C. Alleged Failure to Follow Matter of Thomas and Arreguin**

Rosa's third argument is that the BIA legally erred when it failed to follow its own binding precedent in Matter of Thomas, 21 I. & N. Dec. 20 (BIA 1995), and In Re Arreguin De Rodriguez (Arreguin), 21 I. & N. Dec. 38, 42 (BIA 1995), in concluding that the police report and pending criminal charge alone were sufficient to warrant the denial of discretionary relief. Rosa acknowledges that Matter of Thomas permits the agency to consider non-final criminal charges in making discretionary determinations, but he

_____

[3] Rosa likens the BIA's treatment of the evidence here to that in Aguilar-Escoto, where we held that the BIA's decision "[gave] strong reason to believe the BIA turned a blind eye to key relevant evidence." 59 F.4th 510, 515 (1st Cir. 2023). But Aguilar-Escoto is easily distinguishable. There, the BIA had incorrectly stated that the noncitizen had "provided only two complaints" when in fact, the record contained a third complaint that was highly relevant to a key issue. Id. And on appeal, the government conceded the BIA's mistake as to the number of complaints. Id. at 517. In Rosa's case, there is no comparable statement by the BIA or other evidence to "strongly suggest[] [the BIA] 'completely overlooked critical evidence.'" Id. at 517 (quoting Sihotang v. Sessions, 900 F.3d 46, 51 (1st Cir. 2018)).

- 25 -

argues that the BIA departed from Matter of Thomas and Arreguin insofar as it relied exclusively on the pending charge and "uncorroborated" police report as the bases for denying discretionary relief.

By regulation, the BIA is required to follow its own binding precedent when issuing a non-binding decision. See 8 C.F.R. § 1003.1(g)(1) ("Except as [BIA] decisions may be modified or overruled by the [BIA] or the Attorney General, decisions of the [BIA] . . . are binding on all officers and employees of DHS or immigration judges in the administration of the immigration laws of the United States."); id. § 1003.1(g)(2)-(3) (explaining that certain BIA decisions "will be published and serve as precedents in all proceedings involving the same issue or issues"). Rosa's argument that the BIA exceeded the scope of its binding precedent in Matter of Thomas and Arreguin is a legal question that we have jurisdiction to review under 8 U.S.C. § 1252(a)(2)(D). See, e.g., Arias-Minaya, 779 F.3d at 54 (reviewing the question of whether Arreguin precluded the agency's reliance on the police report in that case); Avila-Ramirez v. Holder, 764 F.3d 717, 722 (7th Cir. 2014) (stating that the question of whether the BIA ignored Arreguin and misread Matter of Thomas was "a question of law that [the circuit court] ha[d] jurisdiction to review"); see also Lumataw v. Holder, 582 F.3d 78, 85 (1st Cir. 2009) ("[A] reviewable 'question of law' is raised

- 26 -

where the agency is charged with misconstruing its own regulations in reaching a decision.").[4]  Here, contrary to the government's position, Rosa's challenge is not merely an attack on the agency's weighing of positive and negative factors in its discretionary fact-finding -- a claim that would be beyond our jurisdiction. Cf. Mele, 798 F.3d at 32-33 (dismissing for lack of jurisdiction a challenge to the agency's reliance on a police report where the petitioner challenged the weight the agency assigned to the police report and did not raise any question of law regarding whether the agency abided by binding precedent).

## 1. **Matter of Thomas**

Turning to the merits of Rosa's argument, we can quickly dispense with Rosa's assertion that Matter of Thomas forecloses the agency's reliance on the police report here.  Consistent with

---

[4] Conversely, in Umana v. Garland, the Second Circuit concluded that it lacked jurisdiction to review a petitioner's challenge to the BIA's use of arrest reports under Arreguin.  See No. 21-6096, 2023 WL 2250441, at *2 (2d Cir. Feb. 28, 2023).  But the Second Circuit explicitly ruled in that manner because the BIA there had cited multiple other negative factors as bases for its denial of discretionary relief, and thus in that court's view it was impossible in the context of that case to determine if the BIA had placed "substantial weight" on the arrest reports without impermissibly reviewing the weight of the evidence.  See id.; see also id. at *2 n.1 (reserving the question of whether the court ever has jurisdiction to review petitions for review of discretionary decisions based on non-exclusive reliance on police reports).  Here, as we will explain, the BIA exclusively relied upon the police report and accompanying indictment to deny relief, and so even under the view expressed in Umana our jurisdiction is sound.

other BIA and circuit precedent, Matter of Thomas permits adjudicators to "consider evidence of unfavorable conduct, including criminal conduct which has not culminated in a final conviction," when deciding applications for discretionary relief. 21 I. & N. Dec. at 23. It directs that "the nature of those contacts [with the criminal law system] and the stage to which those proceedings have progressed should be taken into account and weighed accordingly." Id. at 24. And it specifies that this process of weighing the evidence is case-specific, such that "the probative value of and corresponding weight, if any, assigned to evidence of criminality will vary according to the facts and circumstances of each case and the nature and strength of the evidence presented." Id. Rosa correctly points out that Matter of Thomas almost exclusively relied upon cases involving other negative factors or additional evidence of the petitioners' guilt corroborating the police report and charge. See id. at 24-25. As the Seventh Circuit has explained:

> [Of] the cases the BIA cited [in Matter of Thomas] in support of th[e] proposition [that it is appropriate to consider evidence of criminal conduct which has not culminated in a final conviction,] . . . none involved only uncorroborated police reports. Some, for example, involved guilty pleas or other admissions. Others concerned convictions with a judicial recommendation against deportation. Another case involved a conviction that had been expunged. In short, all of the cases the BIA discussed in Matter of Thomas involved some corroboration beyond

> a mere arrest report.  Save one, that is, and
> it is the one most relevant to our
> circumstances.  Matter of Thomas cited
> favorably to Sierra-Reyes v. I.N.S., 585 F.2d
> 762, 764 n.3 (5th Cir. 1978), which the BIA
> described as "stating that police reports
> implicating respondent in criminal activity
> but which never resulted in prosecution due to
> a lack of sufficient evidence were not
> probative."

Avila-Ramirez, 764 F.3d at 723-24 (citations omitted).

We agree that Matter of Thomas does not definitively authorize sole reliance on a police report lacking any further corroboration to deny discretionary relief.  But Rosa urges us to read Matter of Thomas as establishing the broader rule that "in considering alleged criminal conduct that has not resulted in a conviction in discretionary determinations, that alleged conduct must be corroborated by some additional evidence of guilt or the record must contain additional [negative] factors" in order for the agency to properly rely on the report to deny discretionary relief.  (Emphases added.)  We do not agree that Matter of Thomas pronounces such a sweeping principle.  While Matter of Thomas does not necessarily permit sole reliance on a police report to deny discretionary relief, it does not forbid such sole reliance either.  Therefore, we do not see any conflict between the agency's use of the police report in Rosa's case and Matter of Thomas.

## 2. **Arreguin**

The question of whether the agency's use of the police report here contravened the BIA's binding precedent in Arreguin presents a closer question. Arreguin concerned an application for a waiver of inadmissibility under former section 212(c) of the Immigration and Nationality Act -- which, like an adjustment of status, is another form of discretionary relief. See Arreguin, 21 I. & N. Dec. at 39. In balancing the positive and negative factors relevant to the section 212(c) discretionary decision, the IJ considered an arrest report detailing the applicant's prior arrest for allegations of smuggling undocumented persons from near the border further into the United States. Id. at 42. The applicant denied any wrongdoing as to the conduct described in the arrest report, and prosecution for that conduct was declined. Id. The IJ found the arrest report to be a negative factor and denied the applicant's request for discretionary relief. Id. On appeal, however, the BIA stated:

> Just as we will not go behind a record of conviction to determine the guilt or innocence of a[] [noncitizen], so we are hesitant to give substantial weight to an arrest report, absent a conviction or corroborating evidence of the allegations contained therein. Here, the applicant conceded that the arrest took place but admitted to no wrongdoing. Considering that prosecution was declined and that there is no corroboration, from the applicant or otherwise, we give the apprehension report little weight.

Id.  The BIA then reversed the IJ's decision and granted discretionary relief under section 212(c).  Id. at 42-43.

As Rosa seems to concede, Arreguin certainly does not generally proscribe consideration of police reports without a subsequent conviction in the agency's discretionary decision-making.  See Henry v. I.N.S., 74 F.3d 1, 5-7 (1st Cir. 1996); Arias-Minaya, 779 F.3d at 54.  As we have already emphasized, "an immigration court may generally consider a police report . . . when making a discretionary immigration decision, even if an arrest did not result in a charge or conviction." Mele, 798 F.3d at 32; see also Perez v. Barr, 927 F.3d 17, 20 (1st Cir. 2019); Henry, 74 F.3d at 6; Thomas v. Garland, 25 F.4th 50, 54 (1st Cir. 2022).  But First Circuit precedent does not answer the more nuanced question of whether the agency's decision in this case -- denying discretionary relief based solely on information in a police report and the fact of a pending indictment, without other negative factors or independent corroboration -- contravened Arreguin.

True, in Arias-Minaya, we broadly affirmed that neither our caselaw nor Arreguin "categorically preclude[s] the agency from considering a police report."  779 F.3d at 54 (recognizing that there is no "per se bar to the agency's consideration of" uncorroborated police reports lacking a conviction).  After all, "in the context of determining whether a [noncitizen] warrants

discretionary relief from removal, the fact of an arrest and its attendant circumstances, without more, may have probative value in assessing [the noncitizen's] character (and, thus, his suitability for discretionary relief)." Id. But our recognition that Arreguin "surely does not create an ironclad rule that an arrest without a subsequent conviction may never be considered in the discretionary relief context," id., and that "[p]roperly read, Arreguin implicates matters of degree, explaining the relative weight that should be given to arrest records," Henry, 74 F.3d at 6, is a separate matter from whether the agency may rely solely on a police report and pending indictment, without corroborating evidence or additional negative factors, to deny discretionary relief. The latter issue is one we have not previously considered.

In every case where we permitted reliance on a police report that did not culminate in a conviction to deny discretionary relief, the police report was accompanied by an admission of guilt, other corroborating evidence of guilt, and/or other negative factors that weighed against granting discretionary relief. See, e.g., Thomas, 25 F.4th at 52, 54 (allowing reliance on police report without conviction where IJ had determined other negative factors of sporadic work history and failure to pay taxes or seek work authorization prior to arrest weighed against granting relief); Perez, 927 F.3d at 19 (allowing reliance on police report and other negative factors such as inconsistencies between

petitioner's and his wife's testimony and IJ's conclusion that petitioner showed a "lack of remorse" where record also contained evidence of prior felony convictions); Lima v. Lynch, 826 F.3d 606, 610 (1st Cir. 2016) (allowing reliance on police report and other negative factors, including prior convictions); Henry, 74 F.3d at 2-3, 6-7 (allowing reliance on police report and other convictions).  Similarly, in Arias-Minaya, we approved of the agency's reliance on several negative factors "principally . . . related to the events described in [a] police report" concerning a domestic disturbance to deny discretionary relief.  779 F.3d at 51.  These factors included not only the report itself but also the lack of any denial of the facts alleged in the police report by the petitioner or his counsel before the IJ,[5] as well as the fact that a state court had granted the complaining witness a restraining order against the petitioner. See id. at 51.

On the other hand, in Mele, we left undisturbed an agency decision that seemed to rely solely on a police report in denying discretionary relief.  See 798 F.3d at 31-33.  However, the petitioner in that case challenged only the agency's weighing of the police report against other evidence, which we held to be a

_____

[5] Here, in contrast, Rosa's counsel made clear before the IJ that Rosa denied the allegations in the police report, and Rosa also denied wrongdoing in his statements to the police as recounted in the police report.

jurisdictional bar to our review. Id. at 32-33. In dismissing the petition for lack of jurisdiction, we did not evaluate the propriety of the agency's sole reliance on the police report under Arreguin or other precedent. See id. Rosa's Arreguin challenge thus presents an issue of first impression in this Circuit.

We hold that Arreguin stands for the principle that when exercising its discretion, the agency may not give "substantial weight" to a police report in the absence of "a conviction or corroborating evidence of the allegations contained" in the report. 21 I. & N. Dec. at 42. We further find that here, the agency gave "substantial weight" to the police report in its denial of Rosa's request for discretionary relief. However, we remand to the BIA the question of whether there was "corroborating evidence" in this record of the allegations contained within the police report such that the agency's action in Rosa's case did not contravene Arreguin. See id.

To explain these conclusions, we begin by clarifying Arreguin's scope. Arreguin's holding regarding the proper assignment of weight to a police report applies to discretionary decision-making by the agency broadly, including in the adjustment-of-status context at issue here. While Arreguin involved a discretionary decision in the section 212(c) waiver context, the BIA directed its reasoning as to the proper assignment of weight to a police report absent a conviction or corroborating

evidence to the broad context of balancing the equities in discretionary decision-making.  See id.  Indeed, there is no indication that the portion of the Arreguin decision concerning the proper assignment of weight to a police report was unique to or directly linked to the section 212(c) decision in particular, rather than discretionary decision-making broadly.  See id.

In short, Arreguin's holding as to reliance on police reports is germane to the agency's consideration of positive and negative factors in any discretionary decision-making process and is not limited to the section 212(c) context alone.[6]  See

---

[6] Our decision in Henry v. I.N.S. does not preclude us from interpreting Arreguin in this manner.  There, we concluded that the BIA abided by Arreguin when it considered an arrest report "in a limited way, without giving excessive weight to it."  74 F.3d 1, 7 (1st Cir. 1996).  The BIA there denied discretionary relief based on the petitioner's criminal record, which included not just the allegations described in the police report but also guilty pleas to multiple prior charges.  Id. at 2-4.  After holding that the BIA complied with Arreguin, we indicated in a footnote that the "[p]etitioner's reliance on Arreguin [was] misplaced for other reasons as well."  Id. at 7 n.7.  We remarked that, "[f]or one thing, Arreguin is a section 212(c) waiver case, and there is no requirement that the Board treat section 245(a) status adjustment cases like waiver cases."  Id.  We have no trouble concluding that this language is non-binding dicta.  For example, the footnote appears only after the court itself applied Arreguin in the section 245(a) context and concluded that the BIA did not violate Arreguin.  Id. at 5-7.  Given that analysis, the footnote statement was not "necessary to the result," Arcam Pharm. Corp. v. Faría, 513 F.3d 1, 3 (1st Cir. 2007), nor the "determination of the legal questions then before the court," id. (quoting Municipality of San Juan v. Rullán, 318 F.3d 26, 29 n.3 (1st Cir. 2003)).  Therefore, as a passing reference without substantive reasoning, the Henry footnote does not give us pause in applying Arreguin to a non-section 212(c) case.

Billeke-Tolosa v. Ashcroft, 385 F.3d 708, 712-13 (6th Cir. 2004) (rejecting government's argument that Arreguin did not apply because Arreguin was a section 212(c) waiver case, whereas petitioner in Billeke-Tolosa sought discretionary grant of adjustment of status, and finding that the agency erred by failing to follow Arreguin); see also Garcia Rogel v. Garland, No. 21-1163, 2022 WL 4244508, at *1 (4th Cir. Sept. 15, 2022) (per curiam) (finding violation of Arreguin in a cancellation of removal decision, not under section 212(c)); Doyduk v. Att'y Gen. U.S., 66 F.4th 132, 137 (3d Cir. 2023) (analyzing Arreguin in adjustment-of-status case and distinguishing it on other grounds); Souleman v. Att'y Gen. of U.S., 472 F. App'x 120, 123 (3d Cir. 2012) (per curiam) (same); Lanzas-Ramirez v. U.S. Att'y Gen., 508 F. App'x 885, 889 (11th Cir. 2013) (per curiam) (same). We agree with Rosa that Arreguin applies in adjustment-of-status cases, like Rosa's.

We turn next to Arreguin's text to explain our understanding of its significance. Arreguin's central finding relevant to the police report issue in Rosa's case comes from the opinion's statement that "[j]ust as we will not go behind a record of conviction to determine the guilt or innocence of [a noncitizen], so we are hesitant to give substantial weight to an arrest report, absent a conviction or corroborating evidence of the allegations contained therein." 21 I. & N. Dec. at 42. We do

- 36 -

not understand the use of the word "hesitant" to suggest that the sentence does not establish a firm principle. Indeed, in that sentence, the BIA analogizes the principle about giving substantial weight to a police report absent a conviction or corroboration to the clearly stated rule that it will not second-guess a record of conviction. Accordingly, we find that Arreguin stands for the firm principle that when exercising its discretion, the agency may not give "substantial weight" to a police report in the absence of "a conviction or corroborating evidence of the allegations contained" in the report. Id.; see Avila-Ramirez, 764 F.3d at 719, 725; Garcia Rogel, 2022 WL 4244508, at *4; Billeke-Tolosa, 385 F.3d at 712-13.

Decisions from several of our sister circuits both support our interpretation of Arreguin as standing for the firm principle described above and are relevant to the application of Arreguin in Rosa's case. In some cases that are factually similar to Rosa's -- including cases also arising outside of the section 212(c) context and where the petitioners faced charges for conduct described in the police reports at issue -- our sister circuits have vacated and remanded agency decisions that failed to follow Arreguin's strictures. In Billeke-Tolosa, the Sixth Circuit addressed Arreguin in an adjustment-of-status case where the petitioner was accused of and criminally charged for sexual misconduct involving young girls. 385 F.3d at 709-10, 712-13.

The petitioner, Billeke-Tolosa, pled guilty to lesser charges of misdemeanor assault and disorderly conduct and was never convicted for the sexual misconduct charges. Id. at 709-10. The Sixth Circuit found that the agency contravened Arreguin by considering the allegations of sexual misconduct and relying on the allegations as "the driving force behind the denial of [Billeke-Tolosa's] petition for adjusted status" where Billeke-Tolosa "was not convicted of any such crime, denied committing such a crime, and was confronted with no independent evidence suggesting otherwise." Id. at 712-13. The decision specifically rejected the government's attempt to distinguish Billeke-Tolosa's case from Arreguin on the basis that the noncitizen in Arreguin "was not prosecuted for the conduct alleged in the arrest report," whereas Billeke-Tolosa "was prosecuted and pled guilty." Id. at 712. The Sixth Circuit explained:

> This would certainly be relevant if Billeke-Tolosa had pled guilty to the sex crimes with which he was initially charged. But Billeke-Tolosa pled to simple assault in one case and disorderly conduct in the other; the IJ denied relief due to his concern that Billeke-Tolosa was a sexual deviant. That he was convicted of lesser crimes is beside the point.

Id. On the basis of the agency's failure to follow Arreguin, the Sixth Circuit vacated and remanded to the BIA for additional consideration. Id. at 713.

- 38 -

More recently, the Fourth Circuit similarly held that the agency failed to comply with Arreguin when it gave a police report detailing sexual abuse allegations "dispositive weight" in its determination that the petitioner lacked "good moral character," which led it to deny the petitioner's request for cancellation of removal. Garcia Rogel, 2022 WL 4244508, at *1, *4. Following an investigation into the allegations, the petitioner was arrested and "charged with two counts of aggravated sexual battery . . . and two counts of penetration of the mouth of a child with lascivious intent" in violation of state law. Id. at *2. When the petitioner's accusers recanted their accusations, the prosecution dismissed the charges "nolle prosequi," which is a form of dismissal in Virginia that constitutes "neither a declaration of innocence nor an acquittal," and permits "the prosecution . . . to bring the same charges at a later date." Id. at *2 & n.3. The Fourth Circuit interpreted Arreguin as "limit[ing] the weight an IJ should give to a police report that did not result in a conviction or is not otherwise corroborated." Id. at *4. Accordingly, it held that "Arreguin did not permit the IJ to rely exclusively on the police report in the absence of other evidence to support the information therein." Id. Because the agency did not offer a "reasoned explanation" for its "clear departure from Arreguin," the Fourth Circuit "grant[ed] the petition for review so that the [agency could] reconsider the

police report in light of . . . Arreguin." Id. at *4-6 (quoting De Leon v. Holder, 761 F.3d 336, 344 (4th Cir. 2014)).[7]

The Seventh Circuit has also ruled on this issue, though in a context somewhat more distinguishable from Rosa's compared to the Sixth and Fourth Circuit decisions above. See Avila-Ramirez, 764 F.3d at 719, 724-25. In a section 212(c) case in which the petitioner was never prosecuted for the conduct described in the police reports at issue, the Seventh Circuit held that "the BIA commit[s] legal error by failing to follow its own binding precedent" in Arreguin when it "giv[es] substantial weight to an arrest report absent a conviction or corroborating evidence of the allegations contained therein." Id. at 719.

Finally, the Third and Eleventh Circuits have analyzed Arreguin in adjustment-of-status cases and distinguished it from the cases before them on grounds consistent with our interpretation. Specifically, these courts have treated Arreguin as generally applicable in the adjustment-of-status context but

_____

[7] In an unpublished decision, the Tenth Circuit took a different approach, rejecting the argument that the BIA had contravened Arreguin after distinguishing that precedent on the ground that prosecution had been declined in Arreguin but not in the instant case. See Zamarripa-Castaneda v. Barr, 831 F. App'x 910, 917 (10th Cir. 2020). However, the Tenth Circuit also observed that the agency relied on "several negative factors" in rendering its discretionary decision, not the police report and pending charges alone. Id. at 914. Zamarripa-Castaneda is thus distinguishable from Rosa's case based on the other negative factors weighing against an exercise of discretion there beyond a police report and pending charge alone.

found Arreguin distinguishable because the police report allegations in their cases, unlike in Arreguin, were corroborated by independent evidence in the record. See Doyduk, 66 F.4th at 137 (concluding that "Arreguin lacks force here because the allegations in the police report are corroborated by" several other specific pieces of independent evidence contained in the administrative record); Souleman, 472 F. App'x at 123 (distinguishing Arreguin on the basis that "in contrast [to Arreguin], the IJ [in Souleman's case] considered not only arrest reports, but also" testimony and other evidence corroborating the allegations contained in the reports); Lanzas-Ramirez, 508 F. App'x at 889 ("Here, unlike in Arreguin . . . , the IJ considered not only the 1989 arrest report, but also the deposition of the arresting police officer . . . . Thus, allegations in the 1989 arrest report were corroborated by other evidence, and the IJ and the BIA did not contravene Arreguin."). These circuits' decisions distinguishing their cases from Arreguin based on corroborating evidence of the police report allegations, rather than the adjustment-of-status context or some other differentiating factor, are consistent with our interpretation of Arreguin described above.

With this body of caselaw and our interpretation of Arreguin's firm principle in mind, we proceed to consider whether the agency contravened Arreguin in Rosa's case. First, we find

that it is clear that the agency gave the police report "substantial weight" in denying Rosa discretionary relief. Arreguin, 21 I. & N. Dec. at 42. Specifically, the IJ and BIA did not identify any negative factors in their discretionary analysis other than the police report and the fact of the pending indictment based on the police report. Consequently, the agency explicitly denied discretionary relief on that basis alone: the BIA ruled that it "agree[d] with the [IJ]" that the negative factor of the pending indictment and victim's complaint within the police report "outweigh[ed] the favorable factors [the IJ] set forth."

The agency's reliance on the fact of the pending indictment against Rosa does not undermine our conclusion that the agency placed "substantial weight" on the police report.[8] Arreguin, 21 I. & N. Dec. at 42. The indictment, so far as the record reveals, adds no substance to the allegations against Rosa and thus is not an independent negative factor that could indicate that the agency gave less than substantial weight to the police report. The record also lacks evidence that the indictment was based on anything other than the police report alone. Thus, the

---

[8] Rosa's indictment was not filed anywhere in the record before the agency or before us. As we previously concluded, despite the absence of the indictment in the record, the agency appropriately referenced the fact that Rosa was indicted, as Rosa confirmed the fact that he had a pending charge against him in his testimony before IJ Schools and in his application to adjust status.

agency's reliance on the fact of the indictment here is simply additional reliance on the police report.

The record also does not suggest that the agency considered Rosa's invocation of his Fifth Amendment right to be a separate negative factor in its discretionary decision-making. In fact, the BIA explicitly rejected the notion that Rosa's refusal to testify was a negative factor when it explained that the IJ did not "hold against" Rosa the fact that he chose not to testify. Instead, the BIA explained, the IJ "properly found that the lack of any testimony refuting the version of events portrayed in the victim's complaint and other documentary evidence pertaining to the criminal indictment seriously diminished [Rosa's] ability to meet his burden of demonstrating that he warranted a favorable exercise of discretion." In other words, while Rosa's decision not to testify at the hearing was not a negative factor that weighed against him in the IJ's discretionary balancing, his refusal to provide live testimony refuting the police report allegations made it more difficult for him to overcome the police report and fact of the pending indictment to demonstrate that he warranted a favorable exercise of discretion. Because the agency did not treat Rosa's invocation of the Fifth Amendment as an independent negative factor, the agency's discussion of Rosa's invocation of the Fifth Amendment is not a basis to conclude that the agency gave less than substantial weight to the police report.

So, just like in Arreguin, the BIA here reviewed an IJ decision that gave "substantial weight" to a police report in denying relief. See 21 I. & N. Dec. at 42. But the ultimate question of whether the agency contravened Arreguin requires a determination of whether the agency gave substantial weight to the report "absent a conviction or corroborating evidence of the allegations contained therein." Id. It is undisputed that Rosa was not convicted, so the only remaining question is whether this record contains the type of "corroborating evidence" referenced in Arreguin. Id.

The fact of the indictment here alone falls short of the "corroborating evidence" of the allegations that Arreguin says is necessary to support substantial reliance on a police report absent a conviction. Id.; see Billeke-Tolosa, 385 F.3d at 712. After articulating the firm principle we discussed above, the BIA applied the principle to the Arreguin facts, noting that "the applicant conceded that the arrest took place but admitted to no wrongdoing," and concluding, "[c]onsidering that prosecution was declined and that there is no corroboration, from the applicant or otherwise, we give the apprehension report little weight." Arreguin, 21 I. & N. Dec. at 42 (emphasis added). By separately identifying the fact that prosecution was declined, the Arreguin court made clear that the lack of prosecution is not simply part-and-parcel of whether there is corroborating evidence. See id. In other words,

the fact of a prosecution does not itself constitute corroboration. See id.

Beyond distinguishing "prosecution" from "corroboration" and stating that "corroboration" could be "from the applicant or otherwise," the Arreguin decision gives little explanation of what qualifies as sufficient "corroboration" and whether that corroboration could come from within the police report itself. Id. The BIA's decision on Rosa's application does not address the meaning of "corroboration" under Arreguin or whether such corroboration exists in the record here. Accordingly, we vacate the BIA's decision as to Rosa's application for adjustment of status and remand to the BIA to consider these questions of "corroboration" under Arreguin, the answers to which will elucidate whether denying Rosa discretionary relief after giving the police report substantial weight is permissible under Arreguin.[9]

---

[9] Rosa alleges that the agency's sole reliance on the police report and pending charge is particularly problematic in this case because "Rosa has not had a fair opportunity to rebut the allegation against him in court in the nearly four years that he was detained, largely because [Immigration and Customs Enforcement ("ICE")] repeatedly refused to allow him to attend his own criminal proceedings." Rosa's counsel raised this concern at the hearing before IJ Masters and in Rosa's brief to the BIA, but there does not appear to be any evidence in the administrative record of ICE's purported refusal to allow Rosa to appear. Though we do not base any part of our decision on this allegation, the agency may consider this allegation on remand and determine what, if any, significance to give it in its discretionary analysis of Rosa's application for adjustment of status.

- 45 -

## D. BIA's Finding of Waiver of Voluntary Departure Claim

Rosa's final challenge is to the BIA's ruling in its June 2022 decision that Rosa had waived any challenge to the IJ's decision on his voluntary departure claim. The procedural history of the voluntary departure claim, which we briefly review here, provides important context for this argument. IJ Masters originally granted Rosa's request for voluntary departure as a matter of discretion, finding that the positive equities in Rosa's case outweighed the single negative equity of his pending criminal charge. IJ Masters's decision notes that the government did not oppose a grant of voluntary departure under safeguards. Although Rosa subsequently appealed IJ Masters's decisions on asylum and withholding of removal to the BIA, no party appealed IJ Masters's ruling on voluntary departure.

While the asylum and withholding appeal was pending before the BIA, Rosa's mother became a U.S. Citizen, making Rosa statutorily eligible for adjustment of status and prompting him to move the BIA to remand the case to the IJ to consider his application for adjustment of status. The BIA granted that motion to remand. In its opinion granting remand, the BIA noted that on appeal, Rosa "contest[ed] the denial of both forms of relief and protection" -- referring to the denial of asylum and withholding of removal, not the grant of voluntary departure. (Emphasis added.) It also characterized Rosa's motion to remand as "a motion

to remand in order to pursue adjustment of status." Then, discussing the government's argument that the application to adjust status would be denied in the exercise of discretion if the case were remanded, the BIA "f[ound] it appropriate to remand to allow the [IJ] to make the discretionary assessment in the first instance." It concluded that, "[g]iven [its] instant remand," the BIA would "not reach the additional issues of asylum and withholding of removal," and remanded "for further proceedings consistent with the foregoing opinion and for the entry of a new decision."

On remand, the case was reassigned from IJ Masters to IJ Schools. In her subsequent oral decision after a hearing, IJ Schools explained that "[a]lthough it [was] not completely clear," she "interpret[ed] the BIA remand as a directive to [the IJ on remand] to issue a whole new decision in the case including readdressing [Rosa's] prior I-589 application [for asylum and withholding of removal], his request for voluntary departure, and his new adjustment of status application." (Emphasis added.) In explaining the necessity of reviewing Rosa's request for voluntary departure, IJ Schools pointed out that the BIA "did not address the merits of [Rosa's] previous voluntary departure request" and that the BIA remanded the case for "entry of a new decision." IJ Schools then proceeded to consider anew and ultimately deny Rosa's request for voluntary departure as a matter of discretion because

- 47 -

she "disagree[d] with the decision of the prior [IJ] on how to balance th[e] equities."

Rosa then appealed IJ Schools's decision to the BIA, and his briefing before the BIA largely dictates the issues now before us. Rosa argues that his brief to the BIA challenged not only IJ Schools's denial of Rosa's application for adjustment of status, but also her denial of voluntary departure. Accordingly, he asserts that the BIA erred when it ruled that Rosa did not challenge, and thus waived, appeal of the IJ's adverse voluntary departure ruling. The government disputes Rosa's characterization of his brief to the BIA, asserting that the brief "never asked for review of, and never contested, [IJ Schools's] denial of voluntary departure." All references to voluntary departure in Rosa's brief to the BIA, in the government's view, were solely related to his appeal of the adjustment of status decision. Specifically, the government maintains that Rosa sought to bind IJ Schools to exercise discretion favorably in the adjustment-of-status context based on IJ Masters's previous favorable exercise of discretion on the issue of voluntary departure. Thus, the government asserts there was no error in the BIA's decision to deem waived any challenge to IJ Schools's denial of voluntary departure, and Rosa may not now challenge IJ Schools's voluntary departure denial before us because he failed to exhaust that issue before the BIA.

- 48 -

This court "may review a final order of removal only if . . . the [noncitizen] has exhausted all administrative remedies available to the [noncitizen] as of right," 8 U.S.C. § 1252(d)(1), and "[a] petitioner's 'failure to present developed argumentation to the BIA on a particular theory amounts to a failure to exhaust administrative remedies as to that theory.'" Yong Gao v. Barr, 950 F.3d 147, 153 (1st Cir. 2020) (quoting Avelar Gonzalez v. Whitaker, 908 F.3d 820, 828 (1st Cir. 2018)).[10]

We agree with Rosa that his brief to the BIA sufficiently raised a challenge to IJ Schools's voluntary departure denial and that the BIA erred in deeming that challenge waived. Rosa's brief to the BIA began by identifying three errors in IJ Schools's decision, the first of which was "not accepting the previous favorable exercise of discretion from IJ Masters in granting [Rosa's] request for voluntary departure after examining the same negative factors." The first subsection within the argument section of his brief then focuses on IJ Schools's "err[or] in not

---

[10] The government does not challenge our jurisdiction generally to review a question concerning whether the BIA erred in deeming appeal of a voluntary departure denial waived, and we find that we have jurisdiction over this matter. See Gurrola-Perez v. Garland, No. 21-9504, 2021 WL 6101472, at *2-4 (10th Cir. Dec. 22, 2021) (reviewing a challenge to the BIA's ruling that petitioner had waived a voluntary departure claim); Sica Ixcoy v. Holder, 439 F. App'x 524, 531-32 (6th Cir. 2011) (same). We also note that the exhaustion requirement under 8 U.S.C. § 1252(d)(1) is not jurisdictional. Santos-Zacaria v. Garland, 598 U.S. 411, 416-17 (2023).

accepting IJ Masters'[s] favorable discretionary finding in the context of voluntary departure, where DHS did not oppose the grant of voluntary departure." There, Rosa argues that "IJ Schools grossly and flagrantly abused her discretion in upending the proper weighing of equities in [Rosa's] case originally determined by IJ Masters." Rosa concludes by requesting that the BIA "either reverse the erroneous decision of IJ Schools and grant [Rosa's] application for adjustment of status, or remand his case to IJ Masters, or a different IJ, in order to allow [Rosa] to have his case reconsidered." Rosa's requests for relief are consistent with his intent to appeal both the adjustment of status and voluntary departure decisions: a grant of his application for adjustment of status at that time (before his deportation, which did not occur until after the BIA issued its decision) would have obviated the need for a ruling on his appeal of IJ Schools's voluntary departure decision, and the alternative request for "remand . . . to have his case reconsidered" encompasses reconsideration of both decisions. In making the above-described arguments and seeking these forms of relief, Rosa sufficiently raised a challenge to IJ Schools's voluntary departure denial before the BIA, and the BIA erred in deeming that challenge waived. See Benitez v. Wilkinson, 987 F.3d 46, 56 (1st Cir. 2021) (finding that "[t]here was no failure to exhaust" where petitioner's arguments were "clear from his motion" such that "[t]he [BIA] had

a full opportunity to consider" them); <u>Sunoto</u> v. <u>Gonzales</u>, 504 F.3d 56, 59 (1st Cir. 2007) (stating that the exhaustion doctrine extends to claims omitted from an appeal as well as those "insufficiently developed before the BIA," and opting to apply the "insufficiently developed" standard "generously" (quoting <u>Silva</u> v. <u>Gonzales</u>, 463 F.3d 68, 72 (1st Cir. 2006))).

We also reject the government's alternative argument that Rosa's challenge to the voluntary departure denial is moot under 8 C.F.R. § 1240.26(i). That regulation provides that "[i]f, prior to departing the United States, the [noncitizen] files a petition for review . . . [of] the administratively final order, any <u>grant</u> of voluntary departure shall terminate automatically upon the filing of the petition or other judicial challenge and the alternate order of removal . . . shall immediately take effect." 8 C.F.R. § 1240.26(i) (emphasis added). The government asserts that Rosa's challenge to the ruling on voluntary departure is moot because "voluntary departure would have, in any event, terminated when Mr. Rosa filed his petition for review challenging the agency's discretionary denial of adjustment of status." But at the time Rosa filed the instant petition for review, Rosa had no "grant of voluntary departure" that could be terminated under 8 C.F.R. § 1240.26(i), because IJ Schools had "readdress[ed] . . . anew" Rosa's application for voluntary departure and denied that form of relief. If Rosa had a grant of

- 51 -

voluntary departure following IJ Schools's decision on remand and/or the BIA's review of IJ Schools's decision, he may well have elected to exercise that option and voluntarily departed rather than filing a petition for review before us on the adjustment-of-status issue. We decline to speculate on how he would have proceeded under that counterfactual and reject the notion that the challenge to voluntary departure is moot on this basis.

Though the parties' briefs before us argue the merits of the challenge to IJ Schools's voluntary departure decision (including whether it was proper for her to reconsider that issue at all following IJ Masters's earlier ruling), we decline to reach that issue before the BIA has ruled on it in the first instance. Accordingly, we vacate the BIA's decision as to waiver of Rosa's challenge to the voluntary departure decision and remand to the BIA to consider, in the first instance, whether IJ Schools erred in reversing IJ Masters's prior grant of voluntary departure.

## IV. Conclusion

For the reasons stated above, we grant the petition for review, vacate the BIA's decision as to adjustment of status and

voluntary departure, and <u>remand</u> for further consideration of these issues in accordance with this decision.[11]

---

[11] We also <u>deny</u> the government's motion to dismiss for lack of jurisdiction because we find that we have jurisdiction to consider the legal questions presented in Rosa's petition to the extent described above.  <u>See</u> 8 U.S.C. § 1252(a)(2)(D).